**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Michael J. J. Kinzer,

Plaintiff,

v.

Fabyanske, Westra & Hart, P.A.,

Defendant.

Civil No. 00-855 (DWF/AJB)

**MEMORANDUM OPINION AND ORDER**

---

Elizabeth Glidden, Esq., and Daniel Goldberg, Esq., Hedin & Goldberg, 2100 Stevens Avenue South, Minneapolis, MN 55404, appeared on behalf of Plaintiff.

Holly Robbins, Esq., and Jerry Snider, Esq., Faegre & Benson, 2200 Norwest Center, 90 South Seventh Street, Minneapolis, MN 55402-3901, appeared on behalf of Defendant.

---

## Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on August 17, 2001, pursuant to Defendant's motion for summary judgment and Plaintiff's motion to strike certain exhibits. In the Complaint, Plaintiff alleges disability discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA") and the Minnesota Human Rights Act ("MHRA"). For the reasons set forth below, Defendant's motion is granted in part and denied in part, and the Court defers ruling on Plaintiff's motion.

## Background

Plaintiff Michael Kinzer is an attorney. Kinzer was hired as an associate by Defendant Fabyanske, Westra & Hart, P.A. ("FWH") in 1992.

In September of 1997, Kinzer was diagnosed with Type II diabetes, a form of the disease which can generally be controlled through diet and exercise. In September of 1998, however,

FILED SEP 19 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

Kinzer's physicians determined that he actually suffered from Type I, insulin-dependent diabetes. As a result of his disease, Kinzer must monitor his blood glucose levels throughout the day by means of a self-administered blood test; he must inject himself with insulin several times a day; he must regulate what, when, and how much he eats to manage his blood glucose levels; and he must plan for exercise through appropriate modifications to his diet and insulin schedule. Kinzer's condition also causes him to wake up at night, sometimes to urinate and sometimes because his blood sugar has dropped so he must eat.

In December of 1997–at a point when Kinzer believed he suffered only from Type I diabetes–FWH shareholder Mark Westra had a conversation with Kinzer in which he expressed concern for Kinzer's well-being and suggested that Kinzer take a leave of absence. According to Kinzer,[1] Westra suggested that Kinzer use the leave to consider whether it was in Kinzer's best interests to continue working at FWH or whether Kinzer should instead consider a career or job change. According to Kinzer, he did not want to take a leave of absence, but he asserts that Westra suggested that the possibility of Kinzer making shareholder might be taken off the table if Kinzer did not take a leave of absence.

Kinzer discussed this conversation with another shareholder, Dean Thomson. According to Kinzer,[2] Thomson suggested that Kinzer consider making a claim under the permanent disability policy. Thomson further suggested, according to Kinzer, that Kinzer might use disability payments to facilitate the transition to another career.

---

[1] Westra sharply disagrees with Kinzer's characterization of the conversation.

[2] Again, Thomson sharply disagrees with Kinzer's characterization of the conversation.

Kinzer did request a leave of absence in February and March of 1998, for the purpose of attempting to regulate his condition through diet and exercise (he also underwent a smoking cessation program during his leave).

Kinzer maintains that, when he returned from his leave of absence, no one from the firm came by to welcome him back. Rather, shareholder Greg Spalj told Kinzer he was surprised Kinzer even came back from the leave.[3]

Kinzer was busy from the time he returned from leave until approximately September of 1998. Kinzer asserts that, after September of 1998, he repeatedly requested work and was not given any, so his billable hours declined dramatically.

In February of 1999, Kinzer was considered for shareholder status at the annual shareholder meeting. After agreeing that they would offer Kinzer shareholder status only if 70% of the shareholders agreed, the shareholders conducted a secret ballot. Of the 14 shareholders voting, seven voted in favor of Kinzer and seven voted against him. The shareholders then took a vote to determine whether Kinzer's shareholder status would be denied outright or simply deferred; shareholder Fabyanske stressed that shareholders should only vote to defer if they could realistically foresee changing their minds about Kinzer in the next year, that it would be unfair to string Kinzer along when there was no real hope of him being made a shareholder. The shareholders voted unanimously to defer Kinzer for a year. The shareholders also voted unanimously to give Kinzer a $3,000 raise as a gesture of good will.

---

[3] Although it is clear that Kinzer did not take it as such, Spalj asserts that this was a joke, that an attorney who had tasted the "good life" of not working would never want to return to the stress of firm life.

The night of the shareholder meeting, Dean Thomson phoned Kinzer at home to tell him about the vote. During the conversation, Kinzer expressed his concern that his diabetes had something to do with the decision. Dean Thomson stated that he could "understand how [Kinzer] might read the tea leaves that way," but that he did not think Kinzer's condition had anything to do with the decision.

Three days after the vote, the firm administrator, Stephanie Scheu, met with Kinzer's secretary, Cathy Jensen. Scheu had been approached by Mark Westra who indicated that he had heard a rumor that Kinzer was repeatedly asking Jensen out, to the point of harassing her.[4] Scheu asked Jensen if she felt harassed, Jensen responded adamantly that Kinzer had never asked her out or made her uncomfortable in any way, Scheu told Jensen that she had approached Jensen because of a rumor that was circulating, and that was the end of the matter.

On March 10, 1999, Kinzer forwarded, through his attorney, a draft EEOC charge of disability discrimination to FWH. The EEOC charge was attached to a letter from Kinzer's attorney. In that letter, Kinzer's attorney stated that the "harm to Mr. Kinzer's trust of the Firm is understandably irreparable" and that Kinzer considered the firm's actions to amount to constructive discharge. On March 16, 1999, FWH requested that Kinzer go on a paid leave of absence until the issue was resolved.

Following a review of the situation by an independent investigator and a failed attempt at mediation, FWH concluded that its relationship with Kinzer had disintegrated, that Kinzer and

---

4 Several years before, two legal assistants had requested that they not have to work with Kinzer because he was either abusive and/or sexually harassing. Kinzer was not told of the reasons these legal assistants asked to be separated from him, and the firm did not pursue the allegations any further.

FWH entirely lacked faith in each other. FWH decided to terminate Kinzer's employment on June 22, 1999.

**Discussion**

**1. Summary Judgment Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Fed. R. Civ. P. 1. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

**2. Discrimination Claims**

The parties vigorously dispute whether Kinzer is disabled, or perceived as disabled, within the meaning of the ADA and the MHRA. FWH asserts that Kinzer's diabetes, as

controlled through self-testing and insulin injections, did not substantially limit any major life activity. *See Sutton v. United Airlines, Inc.*, 527 U.S. 471 (1999) (a person's limitations should be measured in the context of mitigating measures available to them). FWH further asserts that there is no evidence that FWH perceived Kinzer's diabetes as substantially limiting any major life activity; to the extent that, as Kinzer alleges, shareholders expressed concerns about Kinzer's ability to continue practicing as a litigation attorney, this does not indicate that the firm perceived Kinzer as limited in his ability to perform a broad class of jobs. *See, e.g., Shipley v. City of University City*, 195 F.3d 1020, 1023 (8th Cir. 1999) ("To be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from a substantial class of jobs."). As a result, FWH contends, Kinzer has failed to carry his *prima facie* burden.[5]

However, even if the Court accepts Kinzer's proposition that he is disabled because his disability does substantially limit a major life activity or because FWH perceived him to be so limited, Kinzer's claim of discrimination fails as a matter of law. FWH has articulated a number of legitimate, non-discriminatory reasons for its actions: (1) Kinzer had a history of problems dealing with office staff; (2) Kinzer had not worked extensively with a number of the

---

[5] The Court is inclined to agree with FWH on this point. Certainly there is absolutely no evidence that FWH regarded Kinzer as substantially limited in his ability to perform a broad class of jobs or in any other major life activity, so Kinzer is not "regarded as" disabled within the meaning of the ADA. Moreover, the evidence in the record, taken in the light most favorable to the Plaintiff, indicates that Kinzer is not substantially limited in the major life activities of eating, exercising, sleeping, or working. It is true that Kinzer is required to monitor his blood sugar levels; he cannot eat exactly what he wants, when he wants it; his sleep is disturbed by the fluctuations in his blood sugar levels; and he must be more cautious about his exercise habits. But none of these requirements or limitations amounts to a "substantial limitation" within the meaning of the ADA. Kinzer does eat regular food, he exercises vigorously and regularly, his sleep disturbances do not–by his own testimony–interfere with his ability to maintain the hectic lifestyle of a litigation attorney, and his need to monitor his blood glucose levels are an inconvenience rather than a limitation.

shareholders who thus did not feel comfortable recommending shareholder status; and (3) it was quite common to defer associates for six months to a year the first time they were considered for shareholder status (four of the current shareholders were deferred the first time they were considered for shareholder status).

Kinzer has offered absolutely no evidence that these legitimate, non-discriminatory reasons for deferring his consideration for shareholder status are merely pretext for discrimination. In fact, the record strongly indicates that these reasons were the true reasons for the decision. Despite Kinzer's desperate attempt to focus on Dean Thomson's remark that Kinzer's concerns were a "reasonable reading of the tea leaves," the fact remains that Dean Thomson denied that Kinzer's disability had any effect on the decision. Moreover, the shareholders voted unanimously to defer, rather than deny, Kinzer's shareholder status and to offer him a raise as a gesture of good faith.

Kinzer attempts to turn the conversation between Scheu and Jensen into a conspiracy to ruin his legal career. The uncontroverted facts simply do not support such an interpretation. It is undisputed that Westra overheard a rumor, however specious, that Kinzer was harassing Jensen. Scheu, as firm administrator, had an obligation to investigate. She asked Jensen if the rumor was true, and, when she was told that everything was alright with Jensen, she let the matter drop. She did *not* generally "publish" a false statement that the harassment did actually take place. This was not a "bogus sexual harassment investigation"; it was one question, discreetly asked, to ensure that a rumor was only a rumor.

In short, even assuming that Kinzer could be considered disabled under the ADA and the MHRA, Kinzer's claims of discrimination fail as a matter of law because he has offered no evidence that FWH's legitimate reasons for its actions are mere pretext to hide discrimination.

**3. Retaliation Claims**

In the Complaint, Kinzer has alleged that FWH terminated him in retaliation for his preparing and filing a claim of discrimination with the EEOC. FWH admits that the discrimination claim, and various statements made in the context of investigating and negotiating the claim, formed the basis for their decision to terminate Kinzer. FWH alleges, however, that they were not motivated by retaliation. Rather, FWH asserts that, in the context of the claim and the subsequent discussions, they determined that Kinzer no longer trusted the firm shareholders, that Kinzer considered some of the shareholders to be liars, that Kinzer had a warped view of his own strengths and weaknesses (or lack thereof), and that Kinzer generally lacked judgment in assessing a situation (specifically, his own situation *vis a vis* the deferment of his promotion to shareholder status). These revelations prompted FWH to conclude that they could no longer entrust their clients to Kinzer, and they were compelled to terminate him.[6]

To make a *prima facie* case for retaliation, Kinzer must show only that he engaged in protected conduct, that FWH took adverse employment action against him, and that the circumstances permit an inference that the two were causally connected. *Hubbard v. United Press Intern., Inc.,* 330 N.W.2d 428 (Minn. 1983). Here, there is no question that Kinzer engaged in statutorily protected conduct (preparing and filing a claim of discrimination with the EEOC) and that Kinzer was subjected to adverse employment action (he was placed on a leave of absence and then terminated[7]). Proximity in time between the protected action of the Plaintiff

---

[6] The Court considers this motion as though all of the material referenced in Plaintiff's Motion to Strike is a part of the record. The Court's decision would be the same with or without those various exhibits.

[7] FWH's attempt to characterize Kinzer's termination as FWH simply accepting (continued...)

and the adverse action of the employer is sufficient basis for inferring a causal connection. *Id.* In this case, the proximity in time between the protected conduct and the adverse employment action is bolstered by FWH's admission that the discrimination claim and subsequent investigation prompted Kinzer's termination.

Once a plaintiff has met his prima facie burden, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the adverse employment action. Here, FWH cites Kinzer's lack of judgment and the irreparable deterioration of mutual trust between Kinzer and the shareholders of FWH. Certainly a fact-finder could conclude that these are legitimate reasons for a law firm to terminate an associate.

Again, then, the burden shifts back to the Plaintiff to show that the proffered reason is mere pretext. Under the circumstances of the case before the Court, the Court cannot say, as a matter of law, that improper motive played no part in FWH's decision to terminate Kinzer. FWH *admits* that Kinzer's EEOC charge and statements made in the context of investigating and mediating that charge prompted the decision to terminate Kinzer. FWH simply asserts that, in the context of Kinzer's discrimination claim, they discovered some underlying problems with Kinzer as an employee at a law firm, problems that required them to terminate him. But it is for a fact-finder, not the Court, to parse out the extent to which FWH was motivated by animosity towards Kinzer as a result of his claims of discrimination and the extent to which FWH was

---

[7](...continued)
Kinzer's resignation is highly suspect. Although Kinzer had, through his attorney, indicated that he considered himself "constructively discharged," he continued to work for the firm after that communication and, when he went on the forced leave of absence, he expressed his willingness to return to work for FWH.

motivated by legitimate concerns which happened to come to light in the context of Kinzer's claims of discrimination.

The Court recognizes that FWH was placed in an unenviable position: it knew that one of its associates felt alienated from the firm and was operating without trust. Yet that unenviable position does not excuse retaliation if, in fact, FWH acted with improper motive. The facts presented are susceptible to multiple interpretations–ranging from a purely retaliatory reason for Kinzer's termination to purely legitimate reason for his termination and every combination of motives in between. As a result, the Court must defer any determination of FWH's true motive to a jury.

The Court will note, however, that the record before the Court does not evince an especially strong case for Kinzer. While there are questions of fact which must be decided by a jury, and there is no way to accurately predict how a jury will interpret the evidence before it, the Court would generally anticipate that a jury is unlikely to be persuaded by Kinzer's arguments. At the same time, it strikes the Court that airing such sensitive employment disputes in court may not be in FWH's best interests, either. Accordingly, the Court strongly encourages the parties to attempt to resolve this matter without taking it to a jury. If the parties cannot reach some agreement, then the Court will obviously give both sides their day in court. But it is the Court's hope that the matter will be resolved without the need for a trial.

**4. Motion to Strike**

This matter is also before the Court on Plaintiff's motion to strike certain exhibits from the record. Specifically, the Plaintiff has moved to strike all references to the mediation session conducted on June 15, 1999 (including any statements by the mediator to FWH regarding the Plaintiff's state of mind); all references to the letter sent by Plaintiff's attorney to FWH which

references the breakdown in trust (on the grounds that it was a settlement offer); the "Robiner Report," which contains references to Plaintiff's denial of any staff problems (on the grounds that the report is hearsay); the minutes from the meeting during which FWH decided to terminate Plaintiff; and the termination letter FWH sent to Plaintiff (because the letter references other items which are the subject of this motion to strike).

Certainly the Court will address these issues in a timely manner if this matter proceeds towards trial. However, the Court considers it prudent at this time to refrain from making any ruling on the admissibility of these items; rather, the Court directs the parties to attempt to resolve this litigation through settlement or mediation. In the event the parties are unable to reach an agreement resolving the litigation, the parties should notify the Court, and the Court will decide the motion to strike at that time.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. Defendant's Motion for Summary Judgment (Doc. No. 21) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a. The motion is **GRANTED** with respect to Plaintiff's claims of disability discrimination under the ADA and the MHRA, as alleged in Counts 2 and 3, and those claims are **DISMISSED WITH PREJUDICE**; and

b. The motion is **DENIED** with respect to Plaintiff's claims of retaliation in violation of the ADA and the MHRA, as alleged in Counts 1 and 3.

Dated: September 19, 2001

DONOVAN W. FRANK
Judge of United States District Court

**Please forward this announcement to the recipient of this fax.**

---

# The United States District Court, District of Minnesota announces two new programs!

**Expedited Trials** –The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition. Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

**Courtroom Technology – Phase II** – In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

**For additional information on either program please visit our website at www.mnd.uscourts.gov.**

---

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500